UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**SCENICVIEW ESTATES, LLC,**

    **Plaintiff,**

v.                                                    Case No.: 2:19-cv-39
                                                      **JUDGE SMITH**
                                                      **Magistrate Judge Vascura**

**ECLIPSE RESOURCES I, LP,** *et al.,*

    **Defendants.**

## OPINION AND ORDER

This matter is before the Court on Defendants Eclipse Resources I, LP ("Eclipse") and SEG-ECR, LLC's ("SEG") (collectively, "Defendants") Motion to Dismiss Plaintiff's First Amended Complaint Pursuant to Rule 12(b)(6) (Doc. 19). Plaintiffs responded (Doc. 22) and Defendants replied (Doc. 27). For the reasons that follow, Defendants' Motion is **DENIED**.

## I.    BACKGROUND

On September 19, 2012, Plaintiff's manager and predecessor-in-interest entered into an oil and gas lease (the "Lease") with Eclipse covering a 43.919-acre property (the "Property") located in Monroe County, Ohio. (Doc. 14, Am. Compl. ¶ 6). The Lease contained a five-year primary term from September 19, 2012 to September 19, 2017 and an option to extend the primary term for an additional five years by paying to Lessor at any time before the expiration of the primary term, a payment of $5,500 per net mineral acre ("Extension Bonus"). (*Id.* ¶ 7). In addition, the Lease would automatically extend into its secondary term if Eclipse conducted operations or produced oil or gas on the Property, or lands pooled therewith. (*Id.* ¶ 8).

The Lease contains three clauses that are of particular importance in the instant matter. The first is a Pugh Clause which states:

> In the event any pool of leases or unit is created by the Lessee, or its successors or assigns, that encompasses lands located outside of the Leasehold, this Lease shall expire upon the expiration of the Primary Term or any extension thereof, insofar, but only insofar, as to any lands comprising the Leasehold that are not included in one or more of such pools or units; **provided, however, that in the event at least 60% of the total net mineral acres comprising the Leasehold are included in one or more pools or units as of the expiration of the Primary Term or any extension thereof, this paragraph shall not apply, and this Lease shall thereafter continue in full force and effect as to the entirety of the lands within the Leasehold and no lands comprising the Leasehold that are located outside of any such pools or units will be released from this Lease upon the expiration of the Primary Term or any extension thereof.**

(the "Pugh Clause") (*Id.* ¶ 9) (emphasis added). Second, the Lease contains a unitization clause by which Scenicview granted to Eclipse "the right to pool, unitize or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by [Eclipse] or by others . . . . Pooling or unitizing in one or more instances shall not exhaust [Eclipse's] pooling and unitizing rights hereunder, and [Eclipse] is granted the right to change the size, shape, and conditions of operation or payment of any unit created." (Doc. 14-1, Ex. B, Paragraph 14). Finally, the Addendum to the Lease states that if there is any conflict between its provisions and the general provisions of the Lease, the Addendum's provisions control. (*Id.*, Ex. B, Addendum at PAGEID# 216). The Addendum further states that "[Eclipse] shall at all times comply with all applicable federal, state, and local laws and regulations relative to its operations conducted on the Leasehold." (*Id.*).

In 2014, Eclipse unitized a 16.712-acre portion of the Property with an adjacent tract of land for drilling purposes. (Doc. 14, Am. Compl. ¶ 10). This unit was referred to as the "Shroyer Unit" and accounted for approximately 38% of the Property. (*Id.*). Eclipse began producing oil and gas from the Shroyer Unit in 2014. (*Id.*). The parties do not contest the validity of this pooling

agreement, nor do they contest that the creation of the Shroyer Unit failed to incorporate the requisite 60% of the Property into a pool or unit, so as to satisfy the Lease's Pugh Clause.

On September 15, 2017, four days before the expiration of the primary term, Eclipse filed a "Declaration of Pooling and Unitization ("DPU") in Monroe County, Ohio, which purported to pool the remainder of the Property (27.207 acres) into another pool, the "Ballpark Unit." (*Id.* ¶ 15). The Ballpark Unit contained 384.479 acres, and on the date the primary term expired, Eclipse had a working interest in 220.608, or about 57.378%, of those acres. In other words, the Ballpark Unit contained many tracts of land, owned by distinct individuals or companies, and Eclipse had leased the mineral rights from the landowners representing approximately 57% of those properties' total acreage. On October 16, 2017, Eclipse filed its first application for a permit to drill a well in the Ballpark Unit. (*Id.* ¶ 26). Ultimately, two wells were drilled on the Ballpark Unit—one on November 29, 2017, and the other on December 11, 2017. *(Id.* ¶ 27). Eclipse amended its Ballpark DPU three times in the months following the expiration of the Primary Term. (*Id.* ¶ 16). These amendments appear to have integrated additional mineral rights obtained by Eclipse from the remaining property owners whose land constituted the Ballpark Unit. When Eclipse's third and final amended DPU was recorded on August 10, 2018, the Ballpark Unit reportedly consisted of 355.549 acres and Eclipse had obtained oil and gas leases from the vast majority, if not all, of the constituent landowners. (Doc. 14-1, Ex. D at PAGEID# 253–262).[1]

Ultimately, at the conclusion of the Primary Term, Eclipse did not pay to Scenicview the Extension Bonus for the portion of the Property that was purportedly part of the Ballpark Unit (the "Remaining Property") but continued its operations on the land. Scenicview filed the instant action

---

[1] It is worth acknowledging that Eclipse's original DPU only identified the Ballpark Unit as containing 220.608 acres, despite the fact that the outlined boundaries of the Unit were identical to those later identified as 384.479 acres in Eclipse's First Amended DPU. (*Compare* Doc. 14-1, Ex. C at PAGEID# 232 *with* Doc. 14-1, Ex. D at PAGEID# 242). Eclipse's First Amended DPU was recorded the same day the second well on the Ballpark unit was drilled.

and brings claims for: 1) declaratory judgment to terminate the Lease; 2) declaratory judgment for breach of the covenant of good faith and fair dealing, or alternatively, 3) breach of contract for breach of the covenant of good faith and fair dealing; 4) quiet title; 5) ejectment/permanent injunction; 6) trespass; 7) conversion/accounting; and 8) slander of title.

## II.  STANDARD OF REVIEW

Defendants bring this motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, alleging that Plaintiffs have failed to state a claim upon which relief can be granted.

Under the Federal Rules, any pleading that states a claim for relief must contain a "short and plain statement of the claim" showing that the pleader is entitled to such relief. Fed. R. Civ. P. 8(a)(2). To meet this standard, a party must allege sufficient facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). A claim will be considered "plausible on its face" when a plaintiff sets forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Rule 12(b)(6) allows parties to challenge the sufficiency of a complaint under the foregoing standards. In considering whether a complaint fails to state a claim upon which relief can be granted, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs. LLC*, 700 F.3d 829, 835 (6th Cir. 2012) (quoting *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)). However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 663. Thus, while a court is to afford plaintiff every inference, the pleading must still contain facts sufficient

to "provide a plausible basis for the claims in the complaint"; a recitation of facts intimating the "mere possibility of misconduct" will not suffice. *Flex Homes, Inc. v. Ritz-Craft Corp of Mich., Inc.*, 491 F. App'x 628, 632 (6th Cir. 2012); *Iqbal*, 556 U.S. at 679.

## III. DISCUSSION

Defendants move to dismiss the entirety of Plaintiff's claims on the theory that the formation of, and subsequent operation of wells within, the Ballpark Unit satisfied the relevant terms of the Lease Agreement so as to extend the Lease into its secondary term without Eclipse having to pay the Extension Bonus to Scenicview. Conversely, Scenicview generally argues that the Ballpark Unit was not properly unitized under Ohio law at the time the primary term expired, nor did Eclipse conduct the operations necessary to extend the Lease into its secondary term. As such, the Lease, as it pertains to the Remaining Property, expired on September 19, 2017, when the Extension Bonus had not been paid.

### A. Unitizing and Pooling Under Ohio Law

The Ohio legislature provides two mechanisms by which oil and gas owner/operators may pool or unitize tracts of land. First, Ohio Revised Code Section 1509.26 covers what are known as "voluntary pooling agreements." Section 1509.26 states, in relevant part, "[t]he owners of adjoining tracts may agree to pool the tracts to form a drilling unit that conforms to the minimum acreage and distance requirements . . .". As the statutory language implies, this option of unitization is only available to owners or to those who have acquired a working interest in the adjoining tracts that comprise the entirety of that particular unit. The second form of unitization and pooling, known as "forced unitization," is detailed in Ohio Revised Code Section 1509.28. Eclipse aptly described forced unitizations as follows:

> O.R.C. § 1509.28 is intended to promote the efficient development of Ohio's oil and gas resources by providing a mechanism for oil and gas owners and operators to apply to the Chief of the Division of Oil and Gas Resources Management of the

5

> ODNR for a mandatory unitization order where such unitization will be "reasonably necessary" to develop the oil and gas resources. (O.R.C. § 1509.28.) Statutory Unitization under 1509.28 is initiated by the filing of an application for unitization under the statute, followed by filing of supporting documentation, a hearing and an Order issued by the Chief . . ."

(Doc. 19, Mot. at 10). Further, forced unitization can be initiated by the Chief's own motion, or "upon application by the owners of sixty-five per cent of the land area overlying the pool[.]" O.R.C. § 1509.28(A).

Having accepted as true that the Shroyer Unit alone did not satisfy the Pugh Clause for the entirety of the Property, the Court must determine whether Plaintiff has adequately stated a claim as to the following issues: 1) Whether the unitization of the Ballpark Unit was valid under Ohio law and the terms of the Lease to satisfy the Lease's Pugh Clause; and 2) Whether Eclipse conducted the operations necessary to continue the Lease into its secondary term. The Court will address each of these issues in turn.

**B.     The Unitization of the Ballpark Unit**

At the outset, the Court feels it necessary to clarify the parties' positions with respect to the relevance of forced unitization and Section 1509.28 in the present matter. Defendants argue that Section 1509.28 has no relevance to the instant action because the parties had a voluntary pooling agreement in place, and Defendants never applied for an order of forced unitization. For its part, Plaintiff argues that it included references to Section 1509.28 in its Complaint to underscore its argument that the Ballpark Unit contained unleased properties on the date the primary term expired, and as such, the only possible unitization and/or pooling mechanism available to Eclipse would have been Section 1509.28. Plaintiff added that Eclipse, even if unitizing under that Section, "did not own 65% of the unitized property," and "was completely outside the bounds of what is permissible under Ohio law." (Doc. 22, Resp. at 6).

Whichever interpretation the Court accepts as true, it is clear that Section 1509.28 is not relevant to the present matter. Eclipse never applied to have the Ballpark Unit pooled or unitized, nor did the Chief initiate the action on his own motion. Accordingly, the Court will now determine whether Scenicview has sufficiently pled that Eclipse failed to pool or unitize the Ballpark Unit prior to the termination of the Lease's primary term.

According to the Lease's terms, Eclipse has "the right to pool, unitize or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by [Eclipse] or by others . . . . Pooling or unitizing in one or more instances shall not exhaust [Eclipse's] pooling and unitizing rights hereunder, and [Eclipse] is granted the right to change the size, shape, and conditions of operation or payment of any unit created." (Doc. 14-1, Ex. B, Paragraph 14). Also, there is an Addendum to the Lease which states that if there is any conflict between its provisions and the general provisions of the Lease, the Addendum's provisions control. (*Id.*, Ex. B, Addendum at PAGEID# 216). The Addendum further states that "[Eclipse] shall at all times comply with all applicable federal, state, and local laws and regulations relative to its operations conducted on the Leasehold." (*Id.*).

Based on the above language, the Court finds that Scenicview has sufficiently pleaded that the Remaining Property was not validly unitized or pooled at the time the primary term expired. It is true that the unitization clause did grant to Eclipse the right to pool any portion of the Property with unleased land, but the superseding Addendum makes clear that any such pooling must be conducted in accordance with Ohio law. As discussed *supra*, that could only be accomplished by using Section 1509.28, which Eclipse did not do. It is clear that Eclipse did not have a working interest in all of the properties located within the boundaries defined in its original DPU. (*See* Doc. 14-1, Ex. C at PAGEID# 232). It is also true that the unitization clause granted to Eclipse

7

the right to "change the size or shape . . . of any unit *created*." (Doc. 14-1, Ex. B, Paragraph 14) (emphasis added). However, accepting Plaintiff's allegations as true, the original DPU did not create a valid pool or unit, and therefore, there was no pool or unit to change the size or shape of. In addition, no such changes were made to validate the Ballpark Unit until after the primary term expired. Eclipse's series of DPU amendments seem to indicate that the Ballpark Unit was always intended to consist of at least 350 acres. Scenicview has sufficiently pled that to be the case, and if it is found to be true, the Ballpark Unit—as it existed on September 19, 2017—contained unowned land and would have been invalid under Ohio law.

In opposing this finding, Eclipse argues that all of Plaintiff's claims "are based on the premise that a [DPU] must meet the same standards and regulations as an application for a drilling permit in Ohio—a practice that is far outside of the industry standards which promote oil and gas development . . ." (Doc. 25, Reply at 5). The Court disagrees with this assessment. While the parties did not brief an in-depth analysis of the specific requirements for obtaining a drilling permit in Ohio, the application process is certainly subject to more scrutiny and requires more of the owner than simply possessing a working interest in all the lands within a pool or unit. In fact, Defendants acknowledge "[t]hrough the drilling permit application, the Division of Oil & Gas Resources Management ("DOGRM") verifies that wells are designed to minimize environmental impacts, that proper environmental safeguards are in place, and that all legal requirements are met." (Doc. 27, Reply at 7) (citing ODNR Regulatory Sections on Permitting, Bonding and Hydrology, http://oilandgas.ohiodnr.gov/regulatory-sections/permitting-bonding-hydrology, last visited April 11, 2019). Scenicview is arguing that the Ballpark Unit was invalid as of September 19, 2017, not that the DPU—which Eclipse recognizes is for public notification purposes only— must meet the same standards as drilling permit applications.

8

The Court is similarly unpersuaded by Eclipse's assertion that the Ohio Department of Natural Resources ("ODNR") approval of the well applications within the Ballpark Unit creates a presumption of validity under Ohio law. As noted above, the ODNR approved the well applications at a time when the DPU had not yet been amended. At this stage of the proceedings, all that is known is that the Ballpark Unit was identified as containing only 220.608 acres and Eclipse as having a working interest of 100% of the land when the ODNR approved Eclipse's drilling permit. Plaintiff has sufficiently pleaded that subsequent amendments to the DPU may reflect that it was always Eclipse's intent that the Ballpark Unit contain between 350 and 385 acres. Any presumption in Defendants' favor is minimized or negated if these well-pled facts are taken as true.

For these reasons, the Court finds that Plaintiff has sufficiently pleaded that the Ballpark Unit was invalid under Ohio law on September 19, 2017. However, dismissal may still be warranted if it is found that Eclipse conducted operations or produced oil or gas on the Remaining Property prior to the primary term's expiration.

**C.      The Lease's Operations Clause**

As noted above, the Lease contained an Operations Clause, which states that the Lease shall extend beyond its primary term if Eclipse conducted operations or produced oil or gas on the Property or lands pooled therewith. The Operations Clause further provides:

> [T]he Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work, including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair well equipment on the Leasehold or any lands pooled or unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the

9

control of the Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory process required for conducting such activities.

(Doc. 14-1, Ex. B at Paragraph 4(A).

In their Motion, Defendants argue that because the Pugh Clause is inapplicable, the operations conducted on the Shroyer Unit in 2014 were sufficient to extend the Lease into its secondary term. However, the Court has already determined that Plaintiff has sufficiently pleaded that the Ballpark Unit was invalid when the primary term expired and the Pugh Clause remained operative as to the Remaining Property. Defendants also point to the following activities as satisfying the Operations Clause:

> In its Amended Complaint, Plaintiff acknowledges that in addition to filing several DPU's related to the Ballpark Unit, Eclipse applied for permits to drill two wells in the Ballpark Unit, in fact, drilled two wells in the Ballpark Unit on November 29, 2017 and December 1, 2017. (First Amended Complaint, ¶¶ 15-16, 26-27). Moreover, based upon publicly available information, the ODNR issued horizontal well drilling permits for the wells described in Paragraph 27 of the First Amended Complaint, which show that the ODNR, in fact, approved wells to be drilled on property located within the Ballpark Unit in its current form, which includes the remaining 27.207 acres of the Subject Land.

(Doc. 19, Mot. at 5). However, all of these operations occurred after the primary term's expiration except the recording of Eclipse's first DPU.

Defendants rely on *Henry v. Chesapeake Appalachia, L.L.C.*, 739 F.3d 909 (6th Cir. 2014) for the proposition that filing a DPU in Ohio constituted "operations sufficient to extend the lease." In *Henry*, the parties entered into a lease with very similar language as found in the present Lease. Also, similar to the case at bar, the lessee in *Henry* filed a DPU several days before the expiration of the lease and thereby pooled the subject property with adjacent properties. The Court examined Ohio case law pertaining to what constituted the commencement of operations, finding that seemingly trivial actions such as driving a stake or surveying the land satisfied the operations clauses in leases. *See, e.g., Duffield v. Russell*, 1899 WL 1336, at *3 (Ohio Cir. Ct. May

10

1899), *aff'd*, 65 Ohio St. 605, 63 N.E. 1127 (1902); *Kaszar v. Meridian Oil & Gas Enterprises, Inc.*, 27 Ohio App. 3d 6, 7, 499 N.E.2d 3 (11th Dist. 1985). Here, there is no record evidence that Eclipse conducted any preliminary physical activities on the Remaining Property. Rather, Scenicview has pleaded that Eclipse relies solely on the DPU's filing as evidence of operations. Ultimately, the court in *Henry* determined that the lessee's DPU did constitute operations under the terms of the lease, but the court relied heavily on the surrounding circumstances. The Court noted that the filing of the DPU did not "occur in a vacuum" because the lessee had already commenced drilling on the adjacent production unit and "the filing of the DPU was an act in an endeavor to join Plaintiffs' property in the production unit that [Lessee] was in the process of exploiting." *Henry*, 739 F.3d at 914. Here, the Ballpark Unit was not producing when Eclipse filed its DPU; drilling did not commence until November 2017. Further, as Plaintiff points out, *Henry* is not analogous because no question was raised as to the legitimacy of the pool itself. As discussed *supra*, here Plaintiff has sufficiently pleaded that the Ballpark Unit itself was invalid.

In sum, Plaintiff has sufficiently pleaded: 1) that the Ballpark Unit was invalid at the time of the primary term's expiration, 2) the Pugh Clause remained operative, and 3) Eclipse's DPU filing did not constitute "operations" under the terms of the Lease.

**D.     Plaintiff's Claims**

As stated above, Plaintiff has brought the following claims against Defendants: 1) declaratory judgment to terminate the Lease; 2) declaratory judgment for breach of the covenant of good faith and fair dealing, or alternatively, 3) breach of contract for breach of the covenant of good faith and fair dealing; 4) quiet title; 5) ejectment/permanent injunction; 6) trespass; 7) conversion/accounting; and 8) slander of title. The parties' arguments in support of, and opposition to, all but the second, third, and eighth claims are entirely predicated on the question of whether the Ballpark Unit was valid at the expiration of the Lease's primary term. Having found

that Scenicview has sufficiently pleaded facts to support that position, the Court **DENIES** Defendants' Motion to Dismiss Counts 1, 4, 5, 6, and 7.

The Court will now turn to Defendants' additional arguments raised with respect to Scenicview's good faith and fair dealing and slander of title claims.

1.  **Counts 2 and 3: Implied Covenant of Good Faith and Fair Dealing**

In addition to the universal argument that the Ballpark Unit is, and always was, valid, Defendants have also posited that Plaintiff's two claims based on the alleged breach of the implied covenant of good faith and fair dealing should be dismissed because the Lease contained a general waiver covering all implied warranties. The Lease states "Lessor and Lessee agree that, except as expressly stated herein, no implied covenants, obligations, or conditions whatsoever shall re read into this Lease . . ." (Doc. 14-1, Ex. B, Paragraph 17). Plaintiff pleaded that all oil and gas leases in Ohio contain an implied covenant of good faith and fair dealing which cannot be waived. (Doc. 14, Am. Compl. ¶¶ 54, 62). Conversely, Defendants argue that "Ohio Appellate Courts have confirmed oil and gas lease language which waives all implied covenants." (Doc. 27, Reply at 11) (citing *Smith v. N.E. Natural Gas* (Sept. 30, 1986), Tuscarawas App. No. 86AP30016, unreported; *Holonko v. Collins* (June 29, 1988), Mahoning App. No. 87CA120, unreported).

In Ohio, oil and gas leases are contracts, "and the terms of the contract with the law applicable to such terms must govern the rights and remedies of the parties." *Harris v. Ohio Oil Co.,* 57 Ohio St. 118, 129, 48 N.E. 502 (1897). "Also under Ohio case law, it is well-established that every contract has an implied covenant of good faith and fair dealing that requires not only honesty but also reasonableness in the enforcement of the contract." *Yoder v. Artex Oil Co.*, 5th Dist. Guernsey No. 14 CA 4, 2014-Ohio-5130, ¶ 52 (citing *PHH Mortg. Corp. v. Ramsey,* 10th Dist. Franklin No. 13AP–925, 2014–Ohio–3519, 17 N.E.3d 629, ¶ 33). In *State ex rel. Claugus*

*Family Farm, L.P. v. Seventh Dist. Court of Appeals*, 145 Ohio St. 3d 180, 47 N.E.3d 836, 2016-Ohio-178, ¶ 31, the Ohio Supreme Court refused to impose an implied covenant to develop land where an oil and gas lease specified that no implied covenant be read into the agreement. However, the few courts that have had the occasion to apply the same principles to the covenant of good faith and fair dealing have been apprehensive at best. *Yoder* acknowledges there is a dearth of case law—both in Ohio and nationally—on whether this particular implied covenant may be waived. Ultimately, the *Yoder* court found it unnecessary to decide the issue because it would not affect the outcome of that particular case. No court has conclusively weighed in on whether a general disclaimer waives this covenant. Faced with this same question, this Court held "this Court cannot say that the implied covenant of good faith and fair dealing is inapplicable to the oil and gas leases presented in the case *sub judice*" and denied the defendant's motion to dismiss. *Cunningham Prop. Mgmt. Tr. v. Ascent Res. - Utica, LLC*, 351 F. Supp. 3d 1056, 1066 (S.D. Ohio 2018) (Sargus, C.J.), *reconsideration denied,* No. 2:16-CV-957, 2020 WL 1227207 (S.D. Ohio Mar. 13, 2020). In keeping with that ruling, the Court **DENIES** Defendants' Motion to Dismiss Counts 2 and 3.

    **2.**    **Count 8: Slander of Title**

In Ohio, slander of title is a tort and requires a plaintiff to show "(1) there was a publication of a slanderous statement disparaging plaintiff's title; (2) the statement was false; (3) the statement was made with malice or made with reckless disregard of its falsity; and (4) the statement caused actual or special damages." *Columbia Gas Transmission Corp. v. Ziegler*, 83 F. App'x 26, 31 (6th Cir. 2003). Plaintiff alleges that the recording of the DPU, its subsequent amendments, and certain wellbore assignments recorded in Monroe County constituted slander of title. Eclipse argues that Plaintiff failed to allege that Eclipse published a slanderous statement because the Lease was renewed into its secondary term upon the formation of the Ballpark Unit. (Doc. 19, Mot. at 17).

The Court has spent considerable time addressing this issue and finds that Plaintiff has sufficiently pleaded that the Lease expired on its terms.

Eclipse also argues Plaintiff failed to satisfy the third element "because they merely assert that Defendants made a 'false and malicious defamation' of Plaintiff's title, without alleging how Defendants knew they [were] publishing a false statement. (*Id.*). "A statement is malicious if made with 'reckless or wanton disregard of the rights of another.' . . . Reckless disregard, in turn, means the defendant 'made the [alleged defamatory] statement with a subjective high degree of awareness that the statement was probably false.'" *Cesario v. Chesapeake Appalachia, L.L.C.,* No. 2:12-CV-1144, 2013 WL 12121965, *2 (S.D. Ohio May 14, 2013) (Watson, J.) (internal citations omitted). Taking Plaintiff's allegations as true, the Court finds that Plaintiff has sufficiently pleaded that Eclipse, a sophisticated and well-versed actor in the field of oil and gas development and drilling, knew or should have known the Ballpark Unit was invalid. Accordingly, **DENIES** Defendants' Motion to Dismiss Count 8.

### 3. Plaintiff's Claims for Punitive Damages

Defendants seek to dismiss Plaintiff's claims for punitive damages in Count 6 for trespass, Count 7 for conversion, and Count 8 for slander of title. In order to recover punitive damages on any of its tort claims, Plaintiff must show actual malice. Malice is defined as "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 32 Ohio St. 3d 334, 336, 512 N.E.2d 1174, 1176 (1987). Plaintiff has sufficiently pleaded that Eclipse attempted to create an invalid pool or unit at the eleventh hour in an attempt to avoid paying Scenicview the Extension Bonus. Taking these allegations as true, Plaintiff has sufficiently stated a claim that Eclipse acted with a conscious

14

disregard for the rights of Scenicview and there was a high probability that Scenicview would be harmed as a result. Therefore, the Court **DENIES** Defendants' Motion to Dismiss Plaintiffs punitive damages claims on Counts 6–8.

### 4. Plaintiff's Claims for Attorneys' Fees

"It has long been established in Ohio that an award of attorney fees must be predicated on statutory authorization or upon a finding of conduct which amounts to bad faith." *Vance v. Roedersheimer*, 64 Ohio St. 3d 552, 556, 597 N.E.2d 153 (1992) (citing *Sorin v. Bd. of Ed. of Warrensville Heights Sch. Dist.*, 46 Ohio St. 2d 177, 347 N.E.2d 527 (1976)). In addition, "[a]ttorney fees are proper when the court has awarded punitive damages." *Boaeuf v. Memphis Station, L.L.C.*, 2018-Ohio-745, 107 N.E.3d 817, ¶ 15 (8th Dist.). Because the Court has found that Plaintiff sufficiently pleaded a claim for punitive damages, it follows that Plaintiff has also pleaded a claim for attorneys' fees. The Court **DENIES** Defendants' Motion to Dismiss Plaintiff's claim for attorneys' fees.

## IV. CONCLUSION

Based on the foregoing, Defendants' Motion to Dismiss is **DENIED**. The Clerk shall **REMOVE** Document 19 from the Court's pending motions list. The parties are encouraged to contact Magistrate Judge Vascura's chambers to schedule a mediation with one of the Court's volunteer mediators.

**IT IS SO ORDERED.**

                                         */s/ George C. Smith*
                                         **GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**