UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

SCENICVIEW ESTATES, LLC,

    Plaintiff,   :

 v.           Case No. 2:19-cv-39
              Judge Sarah D. Morrison
              Magistrate Judge Chelsey M.
ECLIPSE RESOURCES I, LP,   Vascura
*et al.*,          :

    Defendants.

**OPINION AND ORDER**

This dispute centers on a 2012 oil and gas lease, and whether that lease continues in effect today. The case is before the Court on Plaintiff Scenicview Estates, LLC's Partial Motion for Summary Judgment (Pl.'s Mot., ECF No. 49) and Defendants Eclipse Resources I, LP and IOG Resources, LLC's Motion for Summary Judgment[1] (Defs.' Mot., ECF No. 48). Both motions are fully briefed and ripe for consideration. For the reasons that follow, the Court finds that the lease continues in effect and that Defendants' allegedly improper activities on the subject property were authorized under its terms. Accordingly, Defendants' Motion is **GRANTED** and Scenicview's Motion is **DENIED**.

---

[1] Defendants request oral argument on their motion. (*See* Defs.' Mot., 1.) The Court does not find argument to be necessary. Accordingly, the request is **DENIED**.

I.    **FACTUAL BACKGROUND**

    A.    **The Lease**

Sonja M. Taylor and Eclipse entered into an Oil and Gas Lease dated September 19, 2012. (Lease, ECF No. 48-3.) Subject to the Lease terms, Ms. Taylor leased to Eclipse "all the oil and gas . . . contained in, associated with, emitting from, or underlying the" 43.919 acres of Monroe County land constituting the "Leasehold." (*Id.*, § 1, Schedule 1.) The Lease provides, in relevant part, as follows:

> 3. LEASE TERM: This Lease shall remain in force for a primary term of five (5) years from the Lease Date (the "Primary Term"), and shall continue beyond the Primary Term (or any extension thereof) . . . for so long thereafter as . . . operations are conducted on the Leasehold or lands pooled or unitized therewith in search of oil, gas, or their constituents[.]
>
> * * *
>
> 4. NO AUTOMATIC TERMINATION OR FORFEITURE:
>
> (A) CONSTRUCTION OF LEASE: The language of this Lease shall never be read or construed as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth herein. In connection therewith, . . . the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work, including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled or unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, [and] obtaining permits and approvals associated therewith . . . ).
>
> * * *

2

> 14. UNITIZATION AND POOLING: Lessor grants Lessee the right to pool, unitize or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization. Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created. . . .

(*Id.*, §§ 3, 4, 14.) Attached to the Lease as Exhibit A is an "Addendum," which adds to and modifies certain terms in the base Lease:

> **CONFLICT BETWEEN TERMS:** In the event of a conflict or inconsistency between any of the terms and conditions contained in this Addendum and the other terms and conditions contained in the Lease, the terms and provisions contained in this Addendum shall be controlling.
>
> \* \* \*
>
> **POOLED PRODUCTION UNIT LIMIT:** In the event Lessee desires to pool or unitize the Leasehold with other lands and there is no spacing order previously established by a governmental or regulatory body, Lessee shall not have the right to form a production unit, . . . with respect to a proposed horizontal well, that is larger than 640 acres (plus a l0% variance) . . . without the express written consent of Lessor.
>
> \* \* \*
>
> **COMPLIANCE WITH LAWS:** Lessee shall at all times comply with all applicable federal, state and local laws and regulations relative to its operations conducted on the Leasehold.

(*Id.*, Ex. A.)

Ms. Taylor assigned her interest in the Lease to Scenicview in a Quit Claim Deed dated July 14, 2015. (ECF No. 49-2.) Eclipse assigned its interest in the Lease to SEG-ECR LLC, which later assigned the interest to IOG Resources. (*See* ECF No. 36, ¶¶ 36–37; ECF No. 51.)

3

**B.     The Shroyer Unit**

In 2014, Eclipse pooled 19.84 acres of the Leasehold into a drilling unit known as the Shroyer Unit.[2] (Smith Dep., 17:7–21, ECF No. 43-1.) Later that year, a well was drilled, and the Shroyer Unit began producing. It is undisputed that the Lease continues in effect as to the acreage included in the Shroyer Unit. (*Id.*, 17:18–21. *See also* Pl.'s Mot., 3.) Accordingly, any reference to the Leasehold from this point forward will be limited to the acreage **not** pooled into the Shroyer Unit (see illustration below), unless expressly stated otherwise.

**Leasehold — Property Tax Parcel ID 18-034005.0000**



(ECF No. 48-12, PAGEID # 1042, modified to show the Leasehold and Shroyer Unit boundary.)

---

[2] According to Defendants, the Shroyer Unit contains only 16.712 acres of the Leasehold. (Defs.' Mot., 1.) The discrepancy is unexplained, but irrelevant.

4

C.  The Ballpark Unit

By April 2017, Eclipse was working to create a drilling unit next to the Shroyer Unit. (*See* Defs.' Mot., Exs. 2–3.) The Ballpark Unit, as it became known, was the intended site of two horizontal natural gas wells—Ballpark 2H and Ballpark 4H—that shared a well pad with the wells located on the Shroyer Unit. (*See, e.g.*, Defs.' Mot., Ex. 12.)

Eclipse planned the Ballpark Unit between two existing drilling units—the Shroyer Unit and CNX Gas Company's Switz27 Unit. (*See* Defs.' Mot., Ex. 3.) In late-March and April 2017, Eclipse negotiated with CNX to obtain a working interest in CNX-controlled acreage it hoped to include in the Ballpark Unit and to ensure adequate spacing between the proposed Ballpark wells and the existing Switz27 wells. (*See* Defs.' Mot., Exs. 2–4, 6.) Eclipse continued work investigating title and working interest rights in the proposed Ballpark Unit acreage through June and July 2017. (*See* Defs.' Mot., Exs. 7–8.)

In late-July 2017, Eclipse finalized preliminary cost analyses on the Ballpark 2H and 4H wells. (Defs.' Mot., Ex. 11.) The resulting Authorizations for Expenditures ("AFEs") projected the total costs for each well to be $11,164,125 and $11,156,886, respectively. (*Id.*) Eclipse then sent the AFEs and "preliminary unit plats" to two additional companies with working interests inside the proposed unit—Triad Hunter, LLC and Hess Ohio Developments, LLC—seeking their participation in the project. (Defs.' Mot., Exs. 12–13.)

Also in late-July, Eclipse engaged Diversified Engineering to survey the land comprising the Ballpark Unit and prepare a plat map. (Lambert Dep., 27:16–21,

5

ECF No. 47.) That process involved on-site field work[3] (*see, e.g., id.*, 17:3–25), courthouse research (*see, e.g., id.*, 22:5–10), and map drafting (*see, e.g., id.*, 20:2–14, 23:7–15). Diversified Engineering produced a preliminary plat map for Eclipse's review on September 26, 2017. (*Id.*, 27:20–21.)

On September 15, 2017, Eclipse filed a Declaration of Pooling and Unitization ("DPU") for the Ballpark Unit with the Monroe County Recorder's Office.[4] (Defs.' Mot., Ex. 14.) The DPU—which lists thirty leases, including the Lease here at issue—purports to "pool and unitize all rights and formations covered by the [listed leases] in the [Ballpark] Unit to the extent of [Eclipse's] rights therein[.]" (*Id.*, 2.) Marty Byrd, former Eclipse Senior Vice President of Land, testified in his deposition that the company filed DPUs "as a courtesy and a convenience . . . to put . . . third parties on notice that there's a unit out here[.]" (Byrd Dep., 40:2–4.) Mr. Byrd represented that it was his practice to "make sure that [a] DPU is [filed of record] before we drill so we don't have somebody in there buying our leases and encroaching on our unit[.]" (*Id.*, 40:25–41:2.)

Around the same time, Eclipse engaged Precision Rathole to install cellars for the Ballpark wells. (Morris Dep., 18:1–5, ECF No. 46.) A cellar allows underground access to the rig location and constitutes the "first step of a drilling operation[.]" (*Id.*, 18:14–19:3, 20:14–16.) The Ballpark 2H and 4H cellars were dug over

---

[3] Diversified Engineering did not perform an on-site survey of the Leasehold for its work on the Ballpark Unit, because the parcel had been surveyed in connection with the Shroyer Unit development. (Lambert Dep., 34:2–14.)

[4] The Ballpark Unit DPU was subsequently amended several times. (Byrd Dep., 42:1–11. *See also* ECF No. 44-6.)

6

September 17 and 18, and cement was poured on September 19—the fifth anniversary of the execution of the Lease. (*Id.*, 23:9–24:19.)

## II. PROCEDURAL BACKGROUND

Scenicview first filed this action against Eclipse and SEG-ECR in state court on December 3, 2018. (*See* ECF No. 1.) Defendants timely removed the case to this Court on the basis of diversity of citizenship. (*Id.*) Shortly thereafter, Scenicview filed the operative Amended Complaint, asserting the following claims against Eclipse and SEG-ECR:

- <u>Count 1</u>: Declaratory Judgment (termination of the Lease as to the Remaining Property by its terms)
- <u>Count 2</u>: Declaratory Judgment (termination of the Lease as to the Remaining Property by breach of the implied covenant of good faith and fair dealing)
- <u>Count 3</u>: Breach of Contract/Implied Covenant of Good Faith and Fair Dealing
- <u>Count 4</u>: Quiet Title
- <u>Count 5</u>: Ejection
- <u>Count 6</u>: Trespass
- <u>Count 7</u>: Conversion
- <u>Count 8</u>: Slander of Title

(Am. Compl., ECF No. 14.) Eclipse and SEG-ECR moved to dismiss the Amended Complaint for failure to state a claim upon which relief may be granted. (ECF No. 19.) This Court denied the motion, concluding that the Amended Complaint pleaded sufficient factual allegations to support Scenicview's claims, when taken as true. (ECF No. 33.) SEG-ECR has since been dismissed and substituted with IOG Resources as successor-in-interest. (ECF No. 51.)

Eclipse and IOG Resources now move for summary judgment on all claims asserted against them. (*See* Defs.' Mot., *generally*.) Scenicview moves for summary

7

judgment as to Counts 1 (Declaratory Judgment—Lease Termination), 4 (Quiet Title), 6 (Trespass), and 7 (Conversion). (*See* Pl.'s Mot., *generally*.)

### III. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

8

IV. ANALYSIS

Although each of the eight claims asserted in the Amended Complaint has a unique set of elements under Ohio law[5], the parties seem to agree that none are viable if Defendants are found to have conducted their business in accordance with the terms of the Lease. (*See* Defs.' Mot., *generally*; Pl.'s Mot., *generally*.) Because the Court concludes that they have, a claim-by-claim analysis is not necessary.

Oil and gas "leases are contracts, and the terms of the contract with the law applicable to such terms must govern the rights and remedies of the parties." *Shutway v. Chesapeake Expl., LLC*, 134 N.E.3d 721, 729 (Ohio Ct. App. 2019) (internal quotation and citation omitted). "Under Ohio law, the interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008). "[A] contract is 'unambiguous' if a reviewing court 'can give a definite legal meaning' to the contract's terms." *United States v. Ohio*, 787 F.3d 350, 353 (6th Cir. 2015) (quoting *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003)). Where a contract's terms are not ambiguous, the interpreting court must apply the plain language of the contract.

---

[5] Federal courts sitting in diversity apply state substantive law. *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). The forum state's choice-of-law rules determine which state's substantive law will apply. *Miller v. State Farm Mut. Auto. Ins. Co.*, 87 F.3d 822, 824 (6th Cir. 1996). Where, as here, "'neither party argues that the forum state's choice-of-law rules require the court to apply the substantive law of another state, the court should apply the forum state's substantive law.'" *Wilkes Assocs. v. Hollander Indus. Corp.*, 144 F. Supp. 2d 944, 949 n.4 (S.D. Ohio 2001) (quoting *ECHO, Inc. v. Whitson Co., Inc.*, 52 F.3d 702, 707 (7th Cir. 1995)). Consequently, the Court applies the substantive law of Ohio.

9

*Savedoff*, 524 F.3d at 763. "When interpreting a contract, the court must give effect to the intent of the parties to the agreement which is presumed to be mirrored in the language used within the four corners of the agreement." *Shutway*, 134 N.E.3d at 729 (citing *Westfield*, 797 N.E.2d at 1261)). "The meaning of a contract is to be gathered from a consideration of all its parts, and no provision is to be wholly disregarded as inconsistent with other provisions unless no other reasonable construction is possible." *Henry v. Chesapeake Appalachia, L.L.C.*, 739 F.3d 909, 912 (6th Cir. 2014) (quoting *Karabin v. State Auto Mut. Ins. Co.*, 462 N.E.2d 403, 406 (Ohio 1984)).

The Primary Term of the Lease was set to expire on September 19, 2017, *unless* certain conditions extending the Lease were met. The question now presented is whether, as of that date, "operations [were being] conducted on the Leasehold or lands pooled or unitized therewith in search of oil, gas, or their constituents." (Lease, § 3(i).) The Lease defines "conducting operations in search of oil or gas, or their constituents" to include "geophysical and other exploratory work, including, but not limited to, activities to drill an initial well . . . on the Leasehold or any lands pooled or unitized therewith[.]" (*Id.*, § 4(A)(ii).) Such activities include, but are not limited to, "performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, [and] obtaining permits and approvals associated therewith[.]" (*Id.*)

10

The Lease also sets out Eclipse's rights with respect to pooling and unitizing[6] the Leasehold with other lands. The base Lease grants Eclipse

> the right to pool, unitize or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization.

(*Id.*, § 14.) This right is subject to any "conflict[ing] or inconsisten[t]" terms set out in the Addendum. (*Id.*, Ex. A.) Specific to pooling and unitization, the Addendum provides that Eclipse would be required to obtain Ms. Taylor's express written consent to pool or unitize the Leasehold with other lands to form a production unit for a horizontal well that is larger than 640 acres. (*Id.*) And, generally, the Addendum provides that Eclipse "shall at all times comply with all applicable federal, state and local laws and regulations relative to its operations conducted on the Leasehold." (*Id.*)

Defendants argue that, as of September 19, 2017, they were "conducting operations" "on the Leasehold or lands pooled or unitized therewith," sufficient to extend the Primary Term. Defendants point to the planning (*see* Defs.' Mot. Exs. 2– 4, 6, 12–14); budgeting (*see* Defs.' Mot., Ex. 11); title research (*see* Defs.' Mot. Exs.

---

[6] "'Pooling' and 'unitization' are terms of art in the oil and gas industry:

> '[P]ooling refers to the aggregation of two or more tracts of land into a drilling unit of prescribed size . . . . Unitization . . . refers to the combination of most, if not all, of the separate tracts in the field into one tract so that the reservoir may be operated without regard to surface property lines.'"

*Henry*, 739 F.3d at 910, n. 1 (quoting Williams & Meyers, Oil and Gas Law § 901).

11

7–8, 25); surveying, mapping, and platting (*see* Lambert Dep., 15:14–24, 17:3–21, 18L4–6, 20:8–21:1, 21:3–8, 21:15–22:1, 27:16–21; Defs.' Mot Exs. 10, 23–24); and cellar construction (*see* Morris Dep., 12:1–5, 23:9–21; Defs.' Mot. Ex. 17)—all with respect to the Ballpark Unit—that took place between March and September 2017. In their view, this is precisely the "preliminary or preparatory work necessary for drilling" that the parties intended would trigger the Lease extension. (Defs.' Mot., 13–14.)

Scenicview does not disagree that these activities could constitute "operations." (Pl.'s Resp., 10, ECF No. 53.) Instead, it argues that the activities did not extend the Lease because they were not conducted "on the Leasehold or lands pooled or unitized therewith." (*Id.*, 9.) In particular, Scenicview notes that (i) the operations were not conducted <u>literally *on*</u> the Leasehold (*see id.*, 2 ("Th[e] fact of <u>where</u> the operations occurred is crucial.")), and (ii) the Ballpark Unit was not a valid production unit under Ohio law as of September 19, 2017, because, as of that date, the proposed unit contained acreage in which Eclipse did not own a working interest (*id.*, 12).

The Court finds that, under the clear and unambiguous terms of the Lease (including the Addendum), Defendants "conducted operations" "on the Leasehold or lands pooled or unitized therewith" such that the Lease did not expire on September 19, 2017. The Court's analysis starts with the provision of the Lease advising that it "shall be construed against . . . expiration and in favor of giving effect to the continuation of th[e] Lease where the circumstances exist to maintain [it] in

12

effect[.]" (Lease, § 4(A).) *See Lutz v. Chesapeake Appalachia, L.L.C.*, 71 N.E.3d 1010, 1012 (Ohio 2016) (quoting *Skivolocki v. E. Ohio Gas Co.*, 313 N.E.2d 374, syllabus (Ohio 1974)) ("It is a well-known and established principle of contract interpretation that '[c]ontracts are to be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language.'").

Next, the Court considers whether, as of September 19, 2017, Defendants conducted operations on the Leasehold or lands pooled or unitized therewith. The Lease clearly and unambiguously defines "operations" to include "preliminary or preparatory work necessary for drilling" and "conducting internal technical analysis." The Lease does not require that the back-office, technical, or administrative functions that fall within these categories be performed <u>physically on</u> the Leasehold in order to constitute "operations." Such a reading of the Lease (which gives "operations" a wide berth by setting out a non-exhaustive but still extensive list of qualifying activities) would be unreasonable and inconsistent with the Lease Construction provision. Accordingly, the Court finds that Eclipse conducted operations on the Leasehold or lands pooled or unitized therewith sufficient to extend the Primary Term of the Lease beyond September 19, 2017.

Scenicview makes several arguments in favor of a different conclusion, but none is availing. First, it argues that the budgeting, mapping, and platting performed in preparation for drilling on the Ballpark Unit did not "relate to" the Leasehold or the Lease. (Pl.'s Resp., 8–9.) A review of the record evidence shows otherwise. Eclipse maps created as early as March 2017 show the proposed

13

Ballpark Unit and well laterals respectively encompassing and traversing the Leasehold. (Defs.' Mot., Ex. 3.) Maps and budgeting sent in August 2017 to neighboring-interest-holders, seeking their participation in the proposed Ballpark Unit, show the same. (Defs.' Mot., Exs. 12–13.) As further support for the proposition that the preliminary and preparatory work relates to the Lease, the DPU lists the Leasehold as one of thirty parcels intended to be included in the Ballpark Unit. (Defs.' Mot. Ex. 14.)

Scenicview further argues that the Compliance with Laws provision in the Addendum required Eclipse to fully establish the Ballpark Unit as a drilling unit recognized by the Ohio Department of Natural Resources ("ODNR") for the Leasehold to be considered pooled or unitized with other lands. (*See, e.g.*, Pl.'s Mot., *generally*.) In other words, Scenicview takes the position that, because the Ballpark Unit was intended to include lands in which Eclipse did not own a working interest as of September 19, 2017, the Leasehold would not be a part of the Ballpark Unit unless and until ODNR issued a mandatory unitization order pursuant to Ohio Rev. Code § 1509.28.[7] The Court disagrees. [8] The base Lease explicitly permits Eclipse to

---

[7] Scenicview's logic is circular; it demands that a process requiring significant preparatory work be complete before the preparatory work can begin. The Court is not persuaded that the Ballpark Unit was "not valid" under Ohio law as of September 19, 2017—Eclipse had not yet applied to ODNR to test the validity of the unit. Ohio Rev. Code § 1509.28, discussing the "forced unitization" of lands by ODNR, cannot render invalid a unit for which ODNR has received no application.

[8] To the extent this conclusion may be viewed as running counter to the March 26, 2020 Opinion and Order on Defendants' Motion to Dismiss (ECF No. 33), the Court notes that the analysis therein was limited to testing the sufficiency of the Amended Complaint. *See United States ex rel. Holbrook v. Brink's Co.*, 336 F. Supp. 3d 860, 867–68 (S.D. Ohio 2018) (Marbley, J.) (rejecting plaintiff's argument

14

pool or unitize "the Leasehold with other lands, whether contiguous or not contiguous, **leased or unleased, whether owned by [Eclipse] or by others**, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization." (Lease, § 14, emphasis added.) The Addendum explicitly modifies that provision, adding only that Eclipse must obtain written consent if the unit exceeds a certain size. Scenicview asks the Court to interpret the provision of the Addendum requiring Eclipse to comply with applicable law as implicitly requiring Eclipse to initiate and complete a specific state agency-directed process before considering the Leasehold to be part of a drilling unit for purposes of Lease provisions discussing preliminary or preparatory work. The Court declines to do so.

The invocation of *Filicky v. Am. Energy-Utica, LLC*, 645 F. App'x 393 (6th Cir. 2016) does not save Scenicview's argument. Scenicview's Response to Defendants' Motion aptly summarizes *Filicky*:

> In *Filicky*, the plaintiff's lease required the lessee to record a DPU to unitize plaintiff's land into a drilling unit. *Id.* at 394. The lessee, Hess, filed a DPU unitizing plaintiff's land into the "Smith Unit," but no well was ever completed. *Id.* at 394–95. Hess later assigned the plaintiff's lease and the Smith Unit to American Energy-Utica, LLC ("American"). *Id.* at 395. American created a new drilling unit containing plaintiff's land called the "Eureka Unit." *Id.* However, American did not record a DPU for the Eureka Unit and did not record an amendment to the prior Smith Unit DPU until six months after plaintiff's lease expired. *Id.*
>
> Analogous to the case at bar:

---

that the court's factual findings in an opinion on a motion to dismiss under Rule 12(b)(6) were binding for purposes of a motion for summary judgment under Rule 56(a), or that those findings established "the law of the case").

15

> the dispositive issue is whether [plaintiff's] land was *included in a valid pooled unit* for the Eureka well. If [plaintiff's] land was properly pooled with land on which American spudded the Eureka well, her lease would be extended because these "drilling operations" took place before the expiration of the lease. *If her land was not pooled*, American's drilling operations *had no effect* on [plaintiff's] lease and it *expired at the end of its primary term*.
>
> *Id.* (emphasis added.)
>
> The court found that the plaintiff's lease required American to record a DPU to unitize the plaintiff's land and lease into a unit. *Id.* at 398. The recording of the DPU for the Smith Unit was not sufficient to unitize the plaintiff's land into the Eureka Unit because the Eureka Unit was not the same configuration as the Smith Unit. *Id.* at 397. Because the plaintiff's land was not pooled into the Eureka Unit, even the spudding of the Eureka well, which occurred the day *before* plaintiff's lease expired, "did not extend [plaintiff's] lease beyond the primary term." *Id.* at 398.

(Pl.'s Resp., 11.) But Scenicview's added emphasis skips the most important part—namely, the language of the lease itself:

> The amended lease contained a "Pooling Clause" which outlined a formal recording procedure to "pool" Filicky's land into a distinct unit:
>
>> 6. Lessee hereby is given the right at its option, at any time within the primary term hereof or at any time which this lease may be extended by any provision hereof, and from time to time within such period, to pool, reform, enlarge and/or reduce such unit or pool . . . . Each unit or reformation thereof may be created by governmental authority or by Lessee recording in the county recorder's office a Declaration containing a description of the pooled acreage. Any well which is commenced, or is drilled, or is producing on any part of any land theretofore or thereafter so pooled shall, except for payment of royalties, be considered a well commenced, drilled, and producing on leased premises under this lease[.]
>
> Thus, Filicky's land could be pooled only by governmental authority (via forced pooling), or where the lessee recorded a "Declaration

16

containing a description of the pooled acreage" in the Belmont County Recorder's Office.

*Filicky*, 645 F. App'x at 394.

Thus, the lease in *Filicky* explicitly required the lessee to follow a specific procedure to successfully incorporate the subject property into a drilling unit. The situation here is very different. While the Sixth Circuit gave effect to the express terms of Ms. Filicky's lease, Scenicview asks this Court to read an additional requirement into its Lease <u>*despite*</u> (i) a broadly drafted pooling and unitization provision in the base Lease, (ii) an explicit and narrow modification to that provision in the Addendum, and (iii) a Lease Construction provision disfavoring expiration where circumstances exist to maintain the Lease in effect. To read the Lease in such way would run counter to established Ohio law on contract interpretation.

## V. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment (ECF No. 48) is **GRANTED**. Accordingly, Scenicview's Partial Motion for Summary Judgment (ECF No. 49) is **DENIED**. The Clerk is **DIRECTED** to **TERMINATE** this case from the docket records of the United States District Court for the Southern District of Ohio.

    **IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**

17